**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**DAVENPORT DIVISION**

| | |
|---|---|
| HAWKEYE FOODSERVICE DISTRIBUTION, INC., | ) ) ) Case No. _____ |
| Plaintiff, | ) ) |
| v. | ) ) |
| MARTIN BROTHERS DISTRIBUTING COMPANY, INC., IOWA EDUCATORS CORPORATION d/b/a IOWA EDUCATORS CONSORTIUM and DANIEL DREYER | ) **COMPLAINT AND JURY DEMAND** ) ) ) ) ) |
| Defendants. | ) |

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................4

II.     NATURE OF THE ACTION ....................................................................................4

III.    PARTIES ..................................................................................................................6

IV.    JURISDICTION AND VENUE ................................................................................7

V.     FACTUAL BACKGROUND ....................................................................................7

        A.      Exponential Growth of the IEC and Martin Brothers ..............................7

        B.      Defendants' Scheme to Eliminate Competition: Exclusive IEC Pricing and the "Prime Distributor" Arrangement with Martin Brothers ........................................................................................................9

        C.      Bid-Rigging by the IEC and Dryer to Ensure Martin Brothers Is Selected as the IEC's Prime Distributor .................................................11

VI.    ANTITRUST EFFECTS OF DEFENDANTS' CONDUCT ..................................14

        A.      Market Definition ....................................................................................14

        B.      Defendants' Prime Distributor Arrangement Restricts Competition ...........15

C.    The Harm to Competition is Exacerbated by Defendants' 60% Rule ...................................................................................................17

D.    Defendants' Anticompetitive Conduct Has Given Martin Brothers Substantial Market Power and Driven All But a Few Competitors From the Market ...............................................................................18

E.    Injury to Hawkeye and Appropriate Relief .........................................22

COUNT I .....................................................................................................................23

PRICE DISCRIMINATION IN VIOLATION OF THE ROBINSON-PATMAN ACT -- 15 U.S.C. §§ 13-26 ..........................................................23

COUNT II ....................................................................................................................25

EXCLUSIVE DEALING IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT – 15 U.S.C. § 1 ................................................................25

COUNT III ...................................................................................................................26

GROUP BOYCOTT IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT – 15 U.S.C. § 1 ...............................................................26

COUNT IV ...................................................................................................................27

ATTEMPTED MONOPOLIZATION OF THE IOWA MARKET FOR SCHOOL FOODSERVICE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT – 15 U.S.C. § 2 ................................................................27

COUNT V .....................................................................................................................29

RESTRAINTS OF TRADE IN VIOLATION OF THE IOWA COMPETITION LAW - I.C.A. § 553.1-553.19 .........................................29

COUNT VI ...................................................................................................................29

ATTEMPTED MONOPOLIZATION IN VIOLATION OF THE IOWA COMPETITION LAW - I.C.A. §§ 553.1-553.19 .......................................29

COUNT VII ..................................................................................................................30

RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT – 18 U.S.C. §§ 1961-1968 ....................................................................30

COUNT VIII ................................................................................................................... 33

    FRAUDULENT MISREPRESENTATION ................................................................. 33

COUNT IX ...................................................................................................................... 35

    FRAUDULENT NONDISCLOSURE ........................................................................ 35

COUNT X ........................................................................................................................ 37

    MISAPPROPRIATION OF TRADE SECRETS – I.C.A. §§ 550.1-550.8 ...................... 37

REQUESTED RELIEF ..................................................................................................... 38

JURY DEMAND .............................................................................................................. 38

Plaintiff Hawkeye Foodservice Distribution, Inc. (hereinafter "Hawkeye") for its Complaint against Defendants Martin Brothers Distributing Company, Inc. ("Martin Brothers"), Iowa Educators Corporation d/b/a Iowa Educators Consortium ("IEC") and Daniel Dreyer ("Dreyer"), alleges as follows:

## I.    INTRODUCTION

1.    For almost a decade, the Defendants in this lawsuit have engaged in a pattern of conduct designed to prevent open and fair competition in the market for school foodservice in Iowa. Martin Brothers and its former employee, Dan Dreyer, have conspired to co-opt the IEC and use it as an instrument to unlawfully acquire new market share and increased profits for Martin Brothers. The cost of this anti-competitive conduct has been reduced market share and lost profits for Martin Brothers' competitors, and higher food prices for Iowa schools and the families of Iowa schoolchildren. Left unchecked, the Defendants will ultimately succeed in establishing a monopoly for Martin Brothers, eliminating competition in the market, and further increasing foodservice costs for schools.

## II.    NATURE OF THE ACTION

2.    Hawkeye brings this action in response to the Defendants' continuing violations of federal and state antitrust laws prohibiting price discrimination, exclusive dealing, group boycotts, and attempts to monopolize. (15 U.S.C. §§ 1, 2, 13-26; Iowa Code § 553.1-19.) Defendants have also violated the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961-1968) and misappropriated Hawkeye's trade secrets.

3.    Hawkeye and Martin Brothers are foodservice distribution companies. They sell food items at wholesale and provide food-related services to institutional customers. Until 2000,

Hawkeye, Martin Brothers, and other foodservice distributors competed on a level playing field in the Iowa school market. That year, the IEC was created, ostensibly as a purchasing cooperative for Iowa schools. Since then, the IEC, Dreyer and Martin Brothers have conspired in various ways to unlawfully increase Martin Brothers' market share and profits. Because of the unfair advantages enjoyed by Martin Brothers, all but a few of its competitors have been driven from the market.

4.     The IEC uses the combined purchasing power of its member school districts to obtain reduced prices on everything from pencils to personal computers. In all areas other than foodservice, the IEC uses multiple suppliers for these goods. For foodservice, however, the IEC selects a single "prime distributor." [1] All schools that want to take advantage of the IEC's pricing must agree to purchase 60% of their foodservice from the prime distributor. [2] The IEC's prime distributor for foodservice is, and has always been, Martin Brothers.

5.     Through Dreyer, a former Martin Brothers manager and the only person ever to serve as Director of the IEC, the IEC negotiates with brokers and manufacturers to give Martin Brothers discounted pricing and/or allowances. The brokers and manufacturers are told they must give these lower prices only to Martin Brothers or else lose the IEC's business. Thus, Hawkeye and other distributors are unable to obtain the same discounts and allowances, even when they purchase the same goods to resell to the same schools.

---

[1] The 2009-10 contracts between the IEC and school districts refer to the "prime distributor" for foodservice. Exhibit A. In other IEC materials, Martin Brothers is referred to as the "prime vendor." Vendor is a term frequently applied to food manufacturers. To avoid confusion, this Complaint uses the term "prime distributor" to describe the relationship between the IEC and Martin Brothers.

[2] See Cooperative Food Purchasing Agreement, 2010-11, attached hereto as Exhibit B.

6.     As a result of the Defendants' unlawful conduct, Martin Brothers has enjoyed rapidly increasing market share and inflated profits, at the expense of Hawkeye and other distributors.

7.     Hawkeye seeks injunctive relief, treble damages, and attorney fees to remedy these unlawful practices.

### III.   PARTIES

8.     Plaintiff Hawkeye is an Iowa corporation engaged in foodservice distribution to school districts and other institutional customers.   Hawkeye's corporate headquarters and principal place of business is and always has been in Johnson County, Iowa.

9.     Hawkeye and its predecessor, Hawkeye Wholesale Grocery Company, Inc., have served Iowa schools and institutions for more than fifty years as an independent foodservice distributor and consultant.   Today, Hawkeye has more than 450 employees and stocks over 10,000 items for next-day delivery, yet it remains a family-owned business.   Hawkeye is well-known in the foodservice marketplace for its quality products and competitive prices.

10.     In addition to selling food items, Hawkeye provides related services such as menu and cost management, nutrition expertise and analysis, product specification and selection, and kitchen layout and design.

11.     Historically, many of Hawkeye's customers were Iowa schools and school districts that provide meals to students and staff.   These schools and school districts of varying sizes are found across Iowa.

12.     Defendant Martin Brothers, like Hawkeye, is an Iowa corporation engaged in foodservice distribution to schools and other institutional customers.   Martin Brothers' corporate headquarters and principal place of business is in Black Hawk County, Iowa.

13.     Defendant Iowa Educators Corporation conducts business in the name of the "Iowa Educators Consortium" or the "IEC."   It was created as a Chapter 504 nonprofit corporation in 2000 by the Iowa Area Education Agencies ("AEAs").  The IEC's principal place of business is in Black Hawk County, Iowa.

14.     Defendant Dan Dreyer is the Director of the IEC.  Prior to becoming the IEC's first and only Director, Dreyer was employed by Martin Brothers.  Dreyer is a resident of Black Hawk County, Iowa.

## IV.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over Hawkeye's federal claims under 28 U.S.C. § 1331.  The Court also has jurisdiction over Hawkeye's claims arising under the Sherman Act and the Clayton Act pursuant to 28 U.S.C. § 1337.  The Court has supplemental subject matter jurisdiction over Hawkeye's state law claims under 28 U.S.C. § 1367.  The Court has personal jurisdiction over the parties, as set forth herein.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District, under § 1391(c) because Martin Brothers is subject to personal jurisdiction in this District, and under 15 U.S.C. §15(a) because Martin Brothers resides, may be found, or transacts business in this District. Plaintiff is a resident of this District.

## V.     FACTUAL BACKGROUND

### A.     Exponential Growth of the IEC and Martin Brothers

17.     Chapter 273 of the Iowa Code established fifteen Area Education Associations throughout the state.  (As a result of consolidation, there are only nine today.)  The AEAs are

governmental bodies tasked with efficiently providing services to multiple school districts in a particular geographic area.

18.   In 2000, the AEAs then in existence created the IEC to serve as a purchasing cooperative for schools and school districts throughout the state. [3]

19.   Dan Dreyer, a Martin Brothers manager at the time, was intimately involved in the discussions that led to the formation of the IEC. He then left Martin Brothers to become the IEC's first Director.

20.   Small rural schools were the first to join the IEC. [4]  These early members were drawn largely from Martin Brothers' customer base.

21.   By promising food manufacturers a block of business that would grow as more schools joined, and wielding the implicit threat to exclude manufacturers that declined to participate in their scheme, Defendants were able to command prices that were lower than what the individual schools could obtain directly from the manufacturers. [5]

22.   In fact, Dreyer and the IEC have always *required* food manufacturers to guarantee that the IEC will receive the lowest net prices through the best discounts and allowances. [6]

---

[3] Litigation over the legality of the IEC's formation and operation as a non-profit corporation under Chapter 504 of the Iowa Code is currently pending before the Iowa Supreme Court. That case does not affect the claims in this lawsuit. Hawkeye Foodservice Distribution, Inc., v. Iowa Educators Corporation et al, Docket No. 08-2056, submitted to the Iowa Supreme Court after oral argument on October 13, 2010.

[4] *See* IEC Membership Update, Exhibit C.

[5] Manufacturers participating in the IEC food cooperative include such prominent names as General Mill, Kellogg, and Sara Lee.

[6] Exhibit D, letters to manufacturers.

23.     Once Defendants secured exclusive pricing discounts from various food manufacturers, Martin Brothers was able to rapidly expand its school foodservice business in Iowa.  Non-member school districts were told that the only way they could get the lowest food prices was to join the IEC.  The more schools that joined, the more leverage Defendants wielded over the manufacturers and brokers.

24.     As part of their scheme, Defendants regularly threaten manufacturers not to share the exclusive IEC pricing with distributors other than Martin Brothers. [7]  Intimidation tactics have even been used against schools that sought merely to disclose the IEC pricing. [8]

25.     In this fashion, the IEC and Martin Brothers have been able to increase their market share exponentially.

26.     Today, the IEC brags that "we have 378 schools on the program." [9]

**B.     Defendants' Scheme to Eliminate Competition: Exclusive IEC Pricing and the "Prime Distributor" Arrangement with Martin Brothers**

27.     The IEC requires that at least 60% of a member school's foodservice must be purchased from the "prime distributor" chosen by the IEC.  The IEC does not have a minimum purchase requirement for any other type of good.

28.     The IEC has always selected Martin Brothers as its only prime distributor for foodservice.  The fact that a single prime distributor is selected for foodservice stands in stark

---

[7] *See, e.g.*, Letter and Email from Dan Dreyer to "Broker/Vendor" dated May 15, 2007, attached hereto as Exhibit E.

[8] *See, e.g.*, Letter of Elizabeth Hanna dated May 14, 2007, Letter of David H. Mason dated May 16, 2007 and Letter of Noah N. Popp dated May 17, 2007, attached hereto collectively as Exhibit F.

[9] Exhibit G, April 9, 2010, IEC letter to food manufacturers.

contrast to other types of goods available for purchase by IEC members. The IEC's website lists multiple distributors or vendors for *all* of the other product categories, and *negotiated discounts are available to buyers irrespective of the distributor they choose.* In those categories, because discounted pricing is available through multiple distributors, the distributors must engage in free and fair competition, thus creating more opportunities for schools to achieve cost savings.

29.     Rather than making the IEC-negotiated discounts available to other distributors that could sell to IEC members, the IEC and Dreyer strictly forbid food manufacturers from offering the exclusive IEC pricing to anyone other than Martin Brothers. [10] Thus, not only must the schools buy at least 60% of their food purchases from Martin Brothers, they pay higher prices if they buy *any* of the same products from other distributors.

30.     This practice clearly benefits Martin Brothers, but not the school districts the IEC purports to serve.

31.     Traditionally, Iowa schools and school districts used more than one foodservice distributor. That has changed as a result of the exclusive IEC pricing available to schools only through Martin Brothers and the requirement that IEC members purchase 60% of their foodservice from Martin Brothers.

32.     The trend of schools to move toward a single distributor relationship with Martin Brothers has further eroded competition in the school foodservice market.

33.     In return for steering business to Martin Brothers, the IEC collects what it euphemistically calls an "administrative fee" based upon a percentage of sales to member

---

[10] *See* April 2, 2007, April 11, 2008 and April 9, 2010 letters from IEC to food manufacturers, attached hereto as <u>Exhibit D</u>.

schools. This fee purportedly pays the IEC's operating expenses, which include Dreyer's salary, benefits, discretionary pension contribution, automobile, and travel and entertainment expenses.

34.    Contrary to its claim that all savings from discounted prices are returned to member schools, the IEC keeps a hefty balance in excess of one million dollars. The money paid by Martin Brothers to the IEC appears to be more "kickback" than "administrative fee."

35.    Exactly where the administrative fee goes is unknown because neither the IEC, as a non-profit corporation created under Iowa Code Chapter 504A, nor Martin Brothers as a private company, is subject to state audits. [11]

### C.    Bid-Rigging by the IEC and Dryer to Ensure Martin Brothers Is Selected as the IEC's Prime Distributor

36.    The IEC selects the prime distributor for foodservice at its sole discretion.

37.    Although the IEC is ostensibly overseen by a board comprised of representatives from AEAs, it is in reality controlled by Dreyer, its first and only Director.

38.    Dreyer is a former manager at Martin Brothers, where he had responsibilities for school foodservice. He left Martin Brothers in 2000 to start the IEC.

39.    Dreyer has always maintained a close relationship with his former employer. Indeed, until recently, the Martin Brothers website featured photographs of Dreyer and referred to him as a member of the Martin Brothers "K-12 Schools Team." [12]

---

[11] The fact the IEC escapes the state oversight to which the AEAs themselves and Iowa Code Chapter 28E joint governmental entities are subjected is a key reason for Hawkeye's separate state lawsuit against the IEC. *See generally* Hawkeye Foodservice Distribution Inc. v. Iowa Educators Corporation et. al., Docket No. 08-2056.

[12] *See* Excerpt from Martin Brothers website dated May 27, 2008, attached hereto as Exhibit H.

40.     During the IEC's first two years of existence (2000-2001), no bidding occurred for the IEC's prime distributor relationship and all business of the IEC for foodservice was given to Martin Brothers exclusively.  This amounted to a no-bid contract.

41.     Bidding was initiated in 2002, but the results were pre-ordained.   Upon information and belief, Martin Brothers was awarded the 2002 bid even though it did not have the lowest pricing.

42.     For the next five years, until 2007, the IEC chose not to re-open the prime distributor contract for bidding.  During this time, Martin Brothers fully exploited its position as prime distributor to expand market share.

43.     In 2007, Hawkeye's bid was lower than Martin Brothers' bid on the original basket of goods for which the competitors were to submit bids. [13]  This despite the fact that only Martin Brothers had intimate knowledge of the exclusive IEC pricing.  But after Hawkeye submitted the lowest bid, the IEC "moved the goalposts" by removing from the basket many of the items for which Martin Brothers was not the low bidder. [14]

44.     Even after the IEC rigged the market basket to favor Martin Brothers, Hawkeye was *still* the low bidder. [15]   Nonetheless, Martin Brothers was again anointed as prime distributor.

45.     Since 2007, the IEC has chosen to simply "rubber stamp" a renewal of the Martin Brothers prime distributor contract rather than seek new bids.

---

[13] *See* Summary of 2007 bids by total price of market basket, attached hereto as <u>Exhibit I</u>.

[14] *See* Email from Dan Dreyer dated February 16, 2007, attached hereto as <u>Exhibit J</u>.

[15] *Id.*

46.     The United States Department of Agriculture (USDA) recently notified the Iowa Department of Education that the IEC's bidding practices violate federal law. [16]

47.     Under federal law, to contract with Martin Brothers on behalf of its member schools, the IEC must qualify as a "purchasing cooperative."   The USDA questioned the legitimacy of the IEC's claim to be a purchasing cooperative, stating:  "We understand that the IEC refers to itself as a purchasing cooperative, but the information you have provided about its operation in procuring the most recent food vendor contract has raised serious questions about whether it is appropriate to identify IEC as such a cooperative."

48.     The USDA then turned to illegalities in the IEC's bid processes.  Referring to the IEC's contract with Martin Brothers, the USDA stated:  "Beyond the question of whether the IEC does, in fact, act as a purchasing cooperative, there appear to be significant instances in the IEC contract of non-conformance with procurement and cost policies that SFAs [school food authorities] are required to follow in operating the NSLP [National School Lunch Program]."

49.     Among the practices identified by the USDA as violating federal procurement law are (1) the contract allows Martin Brothers to sell SFAs goods that were not part of the original "market basket" of items and thus were not subject to a free and open competitive bidding process, and (2) the "distributor fee" charged to schools and paid to Martin Brothers is calculated illegally, a "clear violation" of federal law. [17]

---

[16] *See* December 2009 Letter from Darlene Sanchez to Julia Thorius, attached hereto as Exhibit K; *see also* Clark Kauffman, "USDA: School agent broke rules," *Des Moines Register*, March 4, 2010, 1A, 8A, attached hereto as Exhibit L.

[17] *See* Exhibit K.

50.     Despite the fact it has been nearly a year since the USDA letter, the IEC has only recently attempted to engage in a new bidding on its tainted contract with Martin Brothers.

## VI.     ANTITRUST EFFECTS OF DEFENDANTS' CONDUCT

### A.     Market Definition

51.     School districts typically purchase their food needs in bundles of goods and services from foodservice companies such as Hawkeye, rather than piecemeal from food manufacturers or other sources.

52.     The bundles of goods and services sold to schools differ materially from, and cannot be substituted with or for, the bundles sold to prisons, hospitals, nursing homes and other types of institutions.   For instance, the federal school lunch program requires that school purchase food in a particular manner to comply with federal regulations.

53.     Because of the unique legal and nutritional requirements that govern the school foodservice business, Hawkeye dedicates specialized resources to its school district customers.

54.     School foodservice is treated as a separate business segment by Hawkeye and its competitors, including Martin Brothers. [18]

55.     The school foodservice industry holds its own trade shows and has its own trade association—the American School Food Service Association—founded in 1946.

56.     For antitrust purposes, school foodservice is a distinct "product market."

57.     Foodservice distributors that sell to schools face increased transportation and other costs when shipping items long distances.   As a result, an increase in the price of school

---

[18] *See* Excerpt from Martin Brothers website, attached hereto as Exhibit M.

foodservice bundles in Iowa would not result in school districts purchasing their food needs from out-of-state firms.

58.    The exclusive pricing negotiated by the IEC is offered only to Iowa schools. As a creation of the AEAs, which are statutorily authorized under Iowa Code Chapter 273 to provide services only within their respective boundaries, the IEC cannot legally serve the interests of those outside the state.

59.    Other distributors that might consider entering the Iowa school foodservice market are effectively deterred by the price discounts available exclusively to Martin Brothers as the IEC's prime distributor. The IEC has thus erected a market barrier preventing foodservice firms outside of Iowa from competing for the business of Iowa school districts.

60.    For these reasons, with respect to school foodservice, the state of Iowa is a distinct "geographic market" for antitrust purposes.

### B.    Defendants' Prime Distributor Arrangement Restricts Competition

61.    Throughout its history, the IEC has permitted only a single prime distributor, Martin Brothers, to access the discounted pricing it negotiates with food brokers and manufacturers.

62.    This discriminatory practice cannot be justified by claimed economies of scale. There are no economies of scale in having an exclusive prime distributor, because food manufacturers provide the same products to all distributors.

63.    There is no rational reason to deny the discounts to other distributors who would sell to Iowa schools. The motivation is plainly to unfairly benefit Martin Brothers.

64.    The IEC's exclusive arrangement with Martin Brothers serves only to increase the latter's market share and profits. There is no benefit to schools.

65.     Indeed, schools would benefit from allowing other distributors to have access to the exclusive IEC pricing. For various reasons, some schools still use other distributors for all of their food purchases, and some IEC member schools look elsewhere than Martin Brothers for part of their purchases. These schools would save money if the IEC-negotiated discounts were available to them when they use other distributors.

66.     Giving multiple distributors access to the IEC discounts would produce efficiencies that would further drive down school foodservice costs. For example, more distributors would mean more local deliveries, which reduce the cost of transporting goods.

67.     Indeed, more distributors would mean more competition generally, and therefore more efficiencies, in all the other aspects that contribute to the cost of school foodservice.

68.     As more schools are drawn to Defendants' scheme by the lower prices, the IEC gains even greater leverage to negotiate even lower prices. The IEC's membership, Martin Brothers' market share, and the harm to competition all continue to "snowball," with no end in sight other than a monopoly for Martin Brothers.

69.     The harm to competition from Defendants' scheme does not end with IEC members. With more trucks on the road and more deliveries being made to more areas, Martin Brothers can leverage the reduction in costs to unfairly compete for the business of schools that are not IEC members (and do not receive the exclusive IEC pricing). This illegitimately increases Martin Brothers' market share even further.

70.     Defendants claim that foodservice prices have decreased for the IEC's members as a result of the arrangement favoring Martin Brothers. The reality is that prices would actually

be *even lower*, if the IEC would allow distributors other than Martin Brothers equal access to the prices negotiated by the IEC.

71.     The IEC is a creature of the Area Education Agencies.  Together, the AEAs are charged with serving <u>all</u> of the accredited public and nonpublic kindergarten through grade twelve schools in Iowa.

72.     But not all Iowa schools are allowed to enjoy the benefits of the special low prices negotiated by the IEC.  Only those schools that agree to buy 60% of their foodservice from Martin Brothers are given access to the exclusive IEC pricing.

73.     The IEC claims to be a nonprofit food purchasing cooperative lawfully organized under state law and operating in compliance with federal law.  As such, the prices negotiated by the IEC should be available to all Iowa schools, regardless of the distributor a school chooses to use, and not just to those that agree to buy from the IEC's prime vendor.

**C.     The Harm to Competition is Exacerbated by Defendants' 60% Rule**

74.     As described above, the IEC requires its members to purchase 60% of their foodservice from Martin Brothers.

75.     In reality, Martin Brothers typically receives *far more* than 60% of the business. To get the full benefit of the lower prices negotiated by the IEC, schools are compelled to buy as much as they can from Martin Brothers.

76.     Moreover, sales of smaller quantities are less profitable for the distributor. Largely because of transportation costs, distributors face substantial pressure to *increase* prices for small deliveries.  This makes it even less likely a school would look to someone other than Martin Brothers.

77.     The few competitors that have not given up in the face of Martin Brothers' competitive advantages have little economic incentive to compete for such a limited amount of business and, given the price differences involved, the school districts have difficulty justifying the use of a competitor even if the competitor is superior in quality and service.

78.     As a practical matter, it simply is not convenient for IEC members to purchase just 60% of their foodservice from Martin Brothers, while fulfilling 40% of their needs by using Hawkeye or another competitor.

79.     To the extent that a school needs or wants to use a "secondary" distributor, they tend to do so only as a back-up in the event that Martin Brothers is out of stock on a critical item. The secondary distributor rarely provides a significant percentage of actual food sales.

80.     The 60% requirement is an effort by the IEC to make it *appear* that competitors can compete for 40% of the business, but in reality this is just an illusion.  The true effect of the 60% requirement is that Martin Brothers secures nearly 100% of the foodservice business from the Iowa schools that belong to the IEC.

### D.     Defendants' Anticompetitive Conduct Has Given Martin Brothers Substantial Market Power and Driven All But a Few Competitors From the Market

81.     Because Defendants' pricing and distribution models are discriminatory and restrict competition, Martin Brothers' market share has rapidly increased.  During a period when the relevant marketplace volume has been flat or declining, Martin Brothers' school sales volume has increased from $6,000,000 to $35,000,000 in less than ten years. [19]

---

[19] Exhibit B.

82.     The effect of Defendants' anticompetitive conduct is compounded by the nature of the Iowa school foodservice market.  Potential competitors face substantial barriers to entry, including the need to invest significant up-front capital.  As just one example, the cost of trucks for local transportation of foodservice products over a large network of schools can be prohibitive.

83.     In addition, the foodservice business is characterized by razor-thin profit margins. Foodservice distributors cannot offset anticompetitive behavior, such as that of the Defendants, by accepting lower profit margins.  Margins are already so slim that such offsetting reductions would be cost-prohibitive.

84.     Since the IEC's creation in 2000, Martin Brothers has quickly gained market share in the Iowa school foodservice market as its competitors have lost business and/or gone out of business entirely.

85.     In 1999, there were approximately twenty-five distributors serving schools in Iowa.  Ten years later, there are only three legitimate competitors with more than a *de minimis* presence remaining in this market:  Martin Brothers; Hawkeye; and Reinhart FoodService.

86.     Two national companies, Sysco Corporation and U.S. Foodservice, still have a nominal presence, but have effectively abandoned the Iowa school foodservice market in recent years.

87.     In 1999, the Iowa school foodservice market was highly fragmented.  No single competitor came close to holding a dominant position in terms of total market share.  Today, Martin Brothers is easily the dominant player.

88.    The following is a description of the competitors as they existed in the market in

1999 and their status today.

| No. | Competitor Name | Location | Market Share |
|-----|-----------------|----------|--------------|
| 1 | Sysco Food Systems of Iowa, Inc. | Des Moines, IA | This competitor once had a large market share and now does very little business in the school foodservice market. |
| 2 | U.S. Foodservice, Inc. | Des Moines, IA | This competitor exited the market.  There are at least two U.S. Foodservice distribution centers located outside the state that could compete for some of the Iowa school foodservice business, but they have not been successful in winning bids. |
| 3 | Pegler-Sysco Food Services Company | Lincoln, NE | This competitor has exited the market. |
| 4 | Strawhacker's (fictitious name) Lancroft Farms, Inc. (legal name) | Ottumwa, IA | This competitor went out of business. |
| 5 | Kohl's Illinois, Inc. | Quincy, IL | This competitor does a small amount of business in the southeastern corner of Iowa. It is not a factor in the relevant market. |
| 6 | Thoms Proestler/PFG | Moline, IL | This competitor does only a nominal amount of business in the relevant market. |
| 7 | Northern Lights Distributing, Inc. | Fort Dodge, IA | The owner, Nick Garst, has stated that he exited the school market due to the dominance of IEC /Martin Brothers and an inability to compete with them. |
| 8 | Martin Brothers Distributing Company, Inc. | Cedar Falls, IA | Martin Brothers now holds the dominant position in the market. |
| 9 | Midwest Foods | Omaha, NE | This large competitor sold out. |
| 10 | K-B Foods Inc. | Omaha, NE | This competitor sold out. |
| 11 | Reinhart Foodservice, L.L.C. | | This competitor is still competing and has a significant share of the market. |
| 12 | Sysco | Baraboo, WI | This competitor competes in only a few districts near the northeast border of the state.  It is no longer a factor in the relevant market. |

| No. | Competitor Name | Location | Market Share |
|---|---|---|---|
| 13 | Fox River Foods, Inc. | Geneva, IL | This competitor has a significant share of the Illinois school foodservice market, but it has not been able to compete in Iowa. |
| 14 | Rock River Provisions, Co., Inc. | Sterling, IL | This competitor went out of business. |
| 15 | Variety Foods, L.L.C. | Sioux Falls, SD | This small competitor has never had a significant share of the Iowa market. |
| 16 | Vallet Food Services, Inc. | Dubuque, IA | This competitor recently went out of business. It was unable to compete in the Iowa school foodservice market. |
| 17 | H&H Distributing Company, Inc. | West Union, IA | This competitor went out of business in 2008. It was unable to compete in the school foodservice market. |
| 18 | Carfrae Meat Company, Inc. | Cedar Rapids, IA | This competitor has exited the market. |
| 19 | Food Services of America, Inc. | Mason City and later Omaha, NE | This competitor sold out to Reinhart. |
| 20 | Draper Foods | Fairmont, MN | This competitor sold out to Hawkeye in 1999. |
| 21 | Farner Bocken | Carroll, IA | This potential competitor has been attempting to enter the school foodservice market for years, but has not been able to do so. It competes against Hawkeye in other markets. |
| 22 | Harker's Distribution, Inc. | Le Mars, IA | This competitor went out of business. Reinhart bought its assets. |
| 23 | Town & Country Wholesale Co. | Belle Plain, IA | This competitor has not been a factor in the schools market. |
| 24 | Braunger Foods, LLC | Sioux City, IA | This competitor sold out to Thompson Companies and is no longer competitive in the school foodservice market. |

89.     The harm to competition at the distributor level is clear.  But it is worth noting

that there has also been competitive harm at the manufacturer level.  Defendants' monopsonistic

market power, exemplified by threat letters sent by the IEC to manufacturers and schools, has

forced manufacturers not just to make the exclusive IEC pricing available only to Martin

Brothers, but also to reduce prices to levels below what the manufacturers would offer in a

purely competitive market. [20]   Manufacturers have thus been at the mercy of Defendants' illegally-procured market power.

### E.      Injury to Hawkeye and Appropriate Relief

90.      As the direct result of Defendants' anticompetitive conduct, Hawkeye is suffering irreparable harm for which it lacks an adequate remedy at law.  Hawkeye can demonstrate a clear likelihood of success on the merits, the balance of hardships weighs heavily in its favor, and the public interest supports the issuance of an injunction.

91.      To restore competition, Hawkeye is entitled to injunctive relief that will end Defendants' discriminatory pricing, exclusive prime distributor scheme, and 60% requirement.

92.      As the direct result of Defendants' anticompetitive conduct, Hawkeye has lost many school and school district customers in Iowa since 1999.  This has caused considerable loss of revenue and profit.

93.      For the profits it has lost to date, Hawkeye is entitled to substantial money damages.

94.      The harm to this formerly competitive industry is extensive and will not be easily reversed even after Defendants' discriminatory pricing and anticompetitive conduct are stopped. Defendants have had a decade to cultivate and cement personal relationships with the food purchasing directors for 375 IEC member schools.  These ties will make it difficult for Hawkeye and other distributors to compete with Martin Brothers on a level playing field.

95.      Moreover, the barriers to changing distributors are substantial for schools and include the inconvenience of new delivery schedules, new order procedures, new credit

---

[20] Exhibit D.

processing policies, new product descriptions, and even new products (e.g. applesauce produced by different manufacturers may have completely different taste, color and texture).

96.     Even with an extraordinary investment of time, money, and other resources, it will take years for Hawkeye to win back school customers.

97.     For its losses that will continue into the future, Hawkeye is entitled to substantial money damages.

## COUNT I

### AGAINST ALL DEFENDANTS

### PRICE DISCRIMINATION IN VIOLATION OF THE ROBINSON-PATMAN ACT -- 15 U.S.C. §§ 13-26

98.     Hawkeye incorporates the allegations of paragraphs 1 through 97 above.

99.     The Robinson-Patman Act prohibits sellers of commodities from discriminating in the prices they charge competing purchasers, where: (1) the commodities are sold in interstate commerce, (2) the commodities are of like grade and quality, and (3) the discrimination adversely affects commerce.   Section 2(f) of the Robinson-Patman Act prohibits knowingly inducing or receiving such price discrimination.

100.    Hawkeye purchases food commodities from manufacturers and resells them to school districts.  Hawkeye competes directly with Martin Brothers in purchasing and reselling these food commodities.

101.    The IEC, working independently and in concert with Dreyer and Martin Brothers, has negotiated discount pricing with numerous food manufacturers.  The IEC has made these discounts available only to Martin Brothers.  The discounts, which are not historically available to Hawkeye when it purchases the same commodities from the same manufacturers, have the

effect of reducing the prices that Martin Brothers pays for commodities.  In their sales to Martin Brothers and to Hawkeye, food manufacturers and/or brokers are thus engaged in price discrimination in violation of the Robinson-Patman Act.

102.    The price discrimination described above is substantial and has occurred for a prolonged period of time, at least ten years.  Many of the sales described above have occurred in interstate commerce because, inter alia, the manufacturers are located outside Iowa and the commodities are sold in Iowa.

103.    The IEC, Dreyer, and Martin Brothers have knowingly induced and received this price discrimination within the meaning of section 2(f) of the Robinson-Patman Act.

104.    As a direct consequence of having to pay more than Martin Brothers for its inputs, Hawkeye has lost significant sales in head-to-head competition with Martin Brothers for customers.  Hawkeye has suffered a competitive injury as the result of the unlawful conduct of Martin Brothers, Dreyer, and the IEC.  By decreasing competition in the market for school foodservice, moreover, the discriminatory pricing has also led to higher food prices for school districts.

105.    Pursuant to 15 U.S.C. § 15, Hawkeye is entitled to recover from the IEC, Dreyer and Martin Brothers three-fold the damages sustained and the costs of suit, including attorney fees.

## COUNT II

## AGAINST ALL DEFENDANTS

## EXCLUSIVE DEALING IN VIOLATION OF SECTION 1
## OF THE SHERMAN ACT – 15 U.S.C. § 1

106.    Hawkeye incorporates the allegations of paragraphs 1 through 105 above.

107.    For the reasons stated above, the relevant product market within the meaning of the antitrust laws is the market for school foodservice.  The relevant geographic market is the state of Iowa.

108.    The IEC, working independently and in concert with Martin Brothers and Dreyer, has formed agreements with school districts throughout Iowa pursuant to which each school district must purchase at least 60% of its foodservice needs from Martin Brothers.   The agreements constitute contracts or combinations within the meaning of section 1 of the Sherman Act.   The purpose and effect of these agreements is to unreasonably restrain trade and competition in the Iowa school foodservice market in violation of section 1 of the Sherman Act. Martin Brothers and Dreyer knowingly combined with the IEC to effectuate the exclusive dealing.

109.    Hawkeye has suffered and will continue to suffer injury to its business and property as a result of these exclusionary agreements.  School districts, moreover, have been forced to pay higher prices as the result of the unlawful conduct of Martin Brothers, Dreyer, and the IEC, and will continue to pay higher prices as a result of this conduct if it is allowed to continue.

110.    Pursuant to 15 U.S.C. § 15, Hawkeye is entitled to recover from the IEC, Dreyer and Martin Brothers three-fold the damages sustained and the costs of suit, including attorney fees.

### COUNT III

### AGAINST ALL DEFENDANTS

### GROUP BOYCOTT IN VIOLATION OF SECTION 1
### OF THE SHERMAN ACT – 15 U.S.C. § 1

111.    Hawkeye incorporates the allegations of paragraphs 1 through 110 above.

112.    For the reasons stated above, the relevant product market within the meaning of the antitrust laws is the market for school foodservice.  The relevant geographic market is the state of Iowa.

113.    The IEC, working independently and in concert with Martin Brothers and Dreyer, coordinates the purchasing activities of numerous school districts across Iowa.  These school districts comprise a substantial majority of the purchasers in the Iowa market for school foodservice.

114.    The IEC, working independently and in concert with Martin Brothers and Dreyer, has put in place policies that encourage or force school districts to purchase all or most of their foodservice from Martin Brothers.  Specifically, the IEC has permitted only Martin Brothers to function as its prime distributor.  Thus, only Martin Brothers has been able to access the discount pricing the IEC has negotiated with food manufacturers.  IEC policy also requires that its members purchase at least 60% of their foodservice needs from Martin Brothers.  Through these policies, the IEC has orchestrated a group boycott of all other Iowa foodservice companies, including Hawkeye.  The group boycott is a combination, conspiracy, or agreement among or

between the IEC and individual school districts. Its purpose and effect is to unreasonably restrain trade and competition in the Iowa market for school foodservice in violation of section 1 of the Sherman Act. Martin Brothers and Dreyer knowingly combined with the IEC to effectuate the group boycott.

115.   Hawkeye has suffered and will continue to suffer injury to its business and property as a result of the group boycott organized and effectuated by the IEC, Martin Brothers, and Dreyer.

116.   Pursuant to 15 U.S.C. § 15, Hawkeye is entitled to recover from the IEC, Dreyer and Martin Brothers three-fold the damages sustained and the costs of suit, including attorney fees.

## COUNT IV

### AGAINST MARTIN BROTHERS

### ATTEMPTED MONOPOLIZATION OF THE IOWA MARKET FOR SCHOOL FOODSERVICE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT – 15 U.S.C. § 2

117.   Hawkeye incorporates the allegations of paragraphs 1 through 116 above.

118.   For the reasons stated above, the relevant product market within the meaning of the antitrust laws is the market for school foodservice. The relevant geographic market is the state of Iowa.

119.   Martin Brothers has willfully engaged, and is engaged, in a course of conduct in order to obtain a monopoly in the Iowa market for school foodservice. There is a dangerous probability that, unless restrained, Martin Brothers will succeed in this goal, in violation of section 2 of the Sherman Act.

120.   Martin Brothers has engaged in anticompetitive conduct with the intention of unlawfully attempting to acquire a monopoly in the Iowa school foodservice market.   Such anticompetitive conduct includes (but is not limited to):

(a)   Martin Brothers has leveraged the IEC's control over school district purchasing decisions to pressure food manufacturers not to deal with Martin Brothers' competitors on terms equal to those afforded to Martin Brothers.

(b)   Martin Brothers has imposed exclusive dealing agreements on school districts.

(c)   Working through the IEC, Martin Brothers has orchestrated a group boycott of Iowa foodservice firms other than Martin Brothers.

121.   Martin Brothers has acted with a specific intent to monopolize, and to destroy competition in, the Iowa school foodservice market.

122.   Martin Brothers' attempted monopolization of the Iowa market for school foodservice has caused and will continue to cause injury to Hawkeye's business and property.

123.   Pursuant to 15 U.S.C. § 15, Hawkeye is entitled to recover from Martin Brothers three-fold the damages sustained and the costs of suit, including attorney fees.

## COUNT V

### AGAINST ALL DEFENDANTS

#### RESTRAINTS OF TRADE IN VIOLATION OF THE
#### IOWA COMPETITION LAW - I.C.A. § 553.1-553.19

124.    Hawkeye incorporates the allegations of paragraphs 1 through 123 above.

125.    Iowa Code § 553.4, part of the Iowa Competition law, prohibits "contract[s], combination[s], or conspirac[ies] between two or more people" that "restrain or monopolize trade or commerce in a relevant market."

126.    The conduct of Martin Brothers, Dreyer, and the IEC described in Counts II, III, and V of this Complaint, and incorporated here by reference, constitutes restraints of trade in violation of the Iowa Competition Law.  Said conduct has injured Hawkeye.

127.    Martin Brothers, Dreyer, and the IEC's conduct in violation of the Iowa Competition Law was willful and flagrant.

128.    Pursuant to Iowa Code § 553.12, Hawkeye is entitled to recover its actual damages, exemplary damages, and its cost of bringing suit, including a reasonable attorney fee.

## COUNT VI

### AGAINST MARTIN BROTHERS

#### ATTEMPTED MONOPOLIZATION IN VIOLATION
#### OF THE IOWA COMPETITION LAW - I.C.A. §§ 553.1-553.19

129.    Hawkeye incorporates the allegations of paragraphs 1 through 128 above.

130.    Iowa Code § 553.5, part of the Iowa Competition law, prohibits "attempt[ing] to establish . . . a monopoly of trade or commerce in a relevant market."

131.   The conduct of Martin Brothers described in Counts IV of this Complaint, and incorporated here by reference, constitutes an attempt to monopolize in violation of the Iowa Competition Law.  Said attempt to monopolize has injured Hawkeye.

132.   Martin Brothers' conduct in violation of the Iowa Competition Law was willful and flagrant.

133.   Pursuant to Iowa Code § 553.12, Hawkeye is entitled to recover its actual damages, exemplary damages, and its cost of bringing suit, including a reasonable attorney fee.

## COUNT VII

### AGAINST MARTIN BROTHERS AND DREYER

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT – 18 U.S.C. §§ 1961-1968

134.   Hawkeye incorporates the allegations of paragraphs 1 through 133 above.

135.   The IEC, Dreyer, and Martin Brothers constitute a RICO enterprise within the meaning of 18 U.S.C. § 1961(4).  Said enterprise is referred to herein as the "RICO Enterprise."

136.   Dreyer and Martin Brothers are persons (within the meaning of 18 U.S.C. § 1961(3)) employed by or associated with the RICO Enterprise.  They conducted the affairs of the RICO Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).  Specifically, Dreyer and Martin Brothers, individually and in concert, caused the RICO Enterprise to engage in acts indictable as violations of the mail or wire fraud statutes, 18 U.S.C. §§ 1341, 1343.  Further, Dreyer and Martin Brothers conspired with each other to violate the provisions of 18 U.S.C. § 1962(c), a violation of 18 U.S.C. § 1962(d).

137.   The RICO Enterprise used the mails and/or wires in furtherance of a scheme to defraud by misrepresenting to manufacturers that Martin Brothers was the winner of a fair and

open bidding process for the status of the IEC prime distributor, and thus encouraging or requiring the manufacturers to give advantageous pricing and allowances to Martin Brothers that were not provided to other distributors.  The following mailings and/or uses of the wires were part of the scheme:

(a)     In or around April or May, 2007, the IEC sent a letter to manufacturers stating: "We formally bid the IEC business and Martin Bros. was the awarded winner. This is a formal bid approved by the IEC Operations Committee and our attorneys.  It was offered to every distributor in the state.  It was a thorough and complete bid process that led to a clear winner.  There was one winner." [21]   On information and belief, the letter was sent by U.S. mail or common carrier from within Iowa to manufacturers outside Iowa.

(b)     On or about April 11, 2008, the IEC sent a letter to manufacturers stating: "We formally bid the IEC business and Martin Bros. was the awarded winner.  This is a formal bid approved by the IEC Operations Committee and our attorneys.  It was offered to every distributor in the state.  It was a thorough and complete bid process that led to a clear winner.  There was one winner." [22]   On information and belief, the letter was sent by U.S. mail or common carrier from within Iowa to manufacturers outside Iowa.

(c)     On or about April 8, 2010, the IEC sent a letter to manufacturers stating: "As you may know, we undergo a formal bid process on regular basis to select the IEC's Prime Distributor.  The most recent bid package was reviewed and approve [sic] by the

---

[21] *See* Exhibit D.

[22] *Id.*

IEC Operations Committee and our attorneys. Every distributor in the state was offered the opportunity to submit a bid. After a thorough and complete review of the bids, Martin Bros. was the clear winner and was the awarded bidder. As such, for the 2010-2011 school year, Martin Bros. will be the IEC's Prime Distributor." [23]  On information and belief, the letter was sent by U.S. mail or common carrier from within Iowa to manufacturers outside Iowa.

138.   As a result of the mail and/or wire fraud described above, manufacturers did give advantageous pricing and allowances to Martin Brothers that were not provided to other distributors. This allowed Martin Brothers to secure business that, but for the scheme to defraud, would have gone to Hawkeye and other distributors.

139.   The RICO Enterprise also used the mails and/or wires in a scheme to defraud school districts and AEAs by misrepresenting to them that Martin Brothers was the winner of a fair and open bidding process for the status of the IEC prime distributor, and thus encouraging or requiring that school districts purchase their foodservice needs from Martin Brothers instead of Hawkeye or other competitors.  Specifically, from at least June 2009 to February 2010, the IEC website contained a "Customer FAQs" page addressed to members.  The website falsely stated that: "The IEC follows legal bidding procedures to acquire competitive statement pricing based on the purchasing volume of many Iowa schools and other eligible clients."

140.   As a result of the mail and/or wire fraud described above, school districts did purchase foodservice from Martin Brothers that it would otherwise have purchased from

---

[23] *Id.*

Hawkeye. Because school districts paid higher prices for such foodservice, the mail and/or wire fraud injured both the districts and Hawkeye.

141.   As a result of this pattern of racketeering, Hawkeye has been injured in its business and property.

142.   Pursuant to 18 U.S.C. § 1964, Hawkeye is entitled to recover from Dreyer and Martin Brothers three-fold the damages sustained and the costs of suit, including attorney fees.

## COUNT VIII

### AGAINST ALL DEFENDANTS

### FRAUDULENT MISREPRESENTATION

143.   Hawkeye incorporates the allegations of paragraphs 1 through 142 above.

144.   Hawkeye has ongoing and prospective business relationships with school districts throughout Iowa and with leading manufacturers that provide food products to both Hawkeye and Martin Brothers.

145.   In order to persuade school districts to sever their relationships with Hawkeye, Martin Brothers, acting through and/or with the IEC and its agent Dreyer, made misrepresentations with regard to Hawkeye's business dealing and ability to compete in this marketplace. Specifically, the Defendants misrepresented to school districts in Iowa that had relationships with Hawkeye that Hawkeye could not provide the same product at a price that would be competitive or similar to the price that Martin Brothers and/or the IEC can offer.

146.   In addition, the Defendants misrepresented to food manufacturers that discount pricing negotiated through the IEC for certain food products could only be used for services provided through Martin Brothers.

147.   Food manufacturers justifiably relied on the representations made by Defendants and accordingly refused to provide similar discounts or allowances to Hawkeye and other competitors in the marketplace.

148.   As a result of the aforementioned misrepresentations, Hawkeye was damaged in that it had to pay higher prices to food manufacturers and lost business as a result of its inability to quote lower prices.

149.   Additional misrepresentations made by Defendants include:

(a)   Misrepresenting Hawkeye's ability to work with the IEC;

(b)   Misrepresenting to school districts Hawkeye's ability to obtain discounted pricing from manufacturers;

(c)   Misrepresenting to school districts that the pricing obtained through Martin Brothers was the lowest pricing available to the districts and that it had been obtained through an impartial bidding process.

150.   Defendants intended to induce school districts to join the IEC and purchase foodservice from Martin Brothers.

151.   School districts justifiably relied on the statements of Defendants and have ceased doing business with Hawkeye because of the misrepresentations made by Dreyer, the IEC and/or Martin Brothers.

152.   As a result of the statements, Hawkeye has lost business with the school districts and has correspondingly lost the income that would result from their sales.

153.   Defendants misrepresented to Hawkeye and other bidders that the process for choosing a prime distributor would be fair and impartial and that bidder's information would be kept confidential.

154.   Defendants intended to induce Hawkeye to submit a bid for the prime distributor contract and reveal confidential pricing information to Defendants.

155.   Hawkeye justifiably relied on the misrepresentations when it submitted a bid and revealed its confidential pricing information to the IEC.

156.   All of the aforementioned misrepresentations were material and Defendants knew the representations were false at the time they were made.

157.   Hawkeye is entitled to recover from the IEC, Dreyer and Martin Brothers compensatory damages, exemplary damages, and the costs of this lawsuit.

## COUNT IX

### AGAINST ALL DEFENDANTS

### FRAUDULENT NONDISCLOSURE

158.   Hawkeye incorporates the allegations of paragraphs 1 through 157 above.

159.   By virtue of their relationships with the IEC members, Defendants had a duty to disclose all material facts to those members.

160.   Defendants failed to explain that Hawkeye and other competitors would be competitively priced if the same allowances made available to Martin Brothers were also made available to other foodservice distributors.

161.   Defendants were aware that school districts were not informed as to the true nature of the discounts and allowances obtained by Martin Brothers.

162.    By virtue of possessing superior information about the bid process to select a prime distributor, Dreyer and the IEC had a duty to disclose all material facts to Hawkeye and other bidders.

163.    Defendants were aware that Hawkeye was not informed as to the true nature of the bidding process to determine a prime distributor.

164.    The aforementioned information was material to the transactions entered into by Hawkeye and the school districts and Defendants intended to deceive Hawkeye and the school districts by withholding such information.

165.    Hawkeye and the school districts justifiably relied upon Defendants' failure to disclose and were justified in such reliance.

166.    The failure to disclose to Hawkeye and the school districts both resulted in harm to Hawkeye by virtue of the disclosure of confidential pricing information and lost business.

167.    Hawkeye is entitled to recover from the IEC, Dreyer and Martin Brothers compensatory damages, exemplary damages, and the costs of this lawsuit.

## COUNT X

### AGAINST ALL DEFENDANTS

### MISAPPROPRIATION OF TRADE SECRETS – I.C.A. §§ 550.1-550.8

168.    Hawkeye incorporates the allegations of paragraphs 1 through 167 above.

169.    During the course of the IEC's bidding process, it obtained confidential pricing information from Hawkeye.  This information was improperly obtained under the guise of a fair bidding process.

170.    Upon information and belief, that confidential pricing information was used by the IEC (and/or Martin Brothers) to negotiate lower prices with food manufacturers without the knowledge or consent of Hawkeye.

171.    That confidential pricing information is essential to the success of Hawkeye in providing foodservice to Iowa schools and was maintained as a trade secret by Hawkeye.

172.    Thus, Defendants misappropriated trade secrets belonging to Hawkeye by using the information presented to the IEC for its use in the market basket portion of the bidding process for the benefit of Martin Brothers, and to the detriment of Hawkeye.

173.    The misappropriation constitutes a violation of Iowa's Uniform Trade Secrets Act and the common law.

174.    The acts of Defendants have resulted in and will continue to result in their unjust enrichment and are damaging Hawkeye's business based on the use of such confidential pricing information; and Defendants, unless restrained, will continue to be unjustly enriched to the prejudice and damage of Hawkeye.

175.    Hawkeye is entitled to recover from the IEC, Dreyer and Martin Brothers compensatory damages, exemplary damages, and the costs of this lawsuit.

## REQUESTED RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    For an award of compensatory damages against the Defendants, trebled pursuant to 15 U.S.C. § 15a and 18 U.S.C. § 1964;

B.    For an injunction prohibiting the Defendants from knowingly inducing or receiving discriminatory pricing, prohibiting the IEC and Dreyer from offering "prime distributor" status to only Martin Brothers to the exclusion of other competitors, prohibiting the IEC and Dreyer from imposing a minimum food purchase requirement on members schools, and prohibiting the Defendants from discouraging manufacturers from disclosing pricing and/or allowances offered to the IEC members;

C.    For punitive damages;

D.    For its attorney fees;

E.    For its costs;

F.    For such other relief as the Court deems proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues triable thereby.

BELIN McCORMICK, P.C.

By _____

|                      |              |
| Stephen R. Eckley    | AT0002250    |
| Lance W. Lange       | AT0004562    |
| David W. Nelmark     | AT0005677    |
| William B. Ortman    | AT0009127    |

666 Walnut Street, Suite 2000
Des Moines, IA  50309-3989
Telephone:  (515) 283-4637
Facsimile: (515) 558-0637
E-mail:   sreckley@belinmccormick.com,
          lwlange@belinmccormick.com
          dwnelmark@belinmccormick.com
          wbortman@belinmccormick.com

ATTORNEYS FOR PLAINTIFF HAWKEYE
FOODSERVICE DISTRIBUTION, INC.